UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**JEANNIE A. LANGRELL**                                                                **PLAINTIFF**

**V.**                              **NO. 4:16-CV-00117 SWW/JTR**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner,**
**Social Security Administration**                                              **DEFENDANT**

## RECOMMENDED DISPOSITION

**I.   Procedures for Filing Objections:**

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Susan Webber Wright. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

**II.  Introduction**:

Plaintiff, Jeannie A. Langrell, applied for disability benefits on January 30, 2013, alleging a disability onset date of August 1, 2012. (Tr. at 17). After conducting a hearing, the Administrative Law Judge ("ALJ") denied her application. (Tr. at 26).

---

[1] Berryhill is now the Acting Commissioner of Social Security and is automatically substituted as Defendant pursuant to Fed. R. Civ. P. 25(d).

The Appeals Council denied her request for review. (Tr. at 1). Thus, the ALJ's decision now stands as the final decision of the Commissioner. Langrell has requested judicial review.

For the reasons stated below, the Commissioner's decision should be affirmed.

### III. **The Commissioner's Decision:**

The ALJ found that Langrell had not engaged in substantial gainful activity since the alleged onset date of August 1, 2012. (Tr. at 20). At Step Two, the ALJ found that Langrell has the following severe impairments: fibromyalgia, bilateral foot pain status post surgeries, diabetes mellitus with neuropathy, back pain (lumbago), and obesity. (Tr. at 20).

After finding that Langrell's impairments did not meet or equal a listed impairment (Tr. at 21), the ALJ determined that Langrell had the residual functional capacity ("RFC") to perform light work except that she: 1) could lift and carry no more than 20 pounds at a time; 2) could frequently carry up to 10 pounds; 3) could perform activities that require a good deal of walking or standing; and 4) could perform work where interpersonal contact is routine but superficial, the complexity of tasks is learned by experience, involves several variables, uses judgment within limits, and requires little supervision for routine tasks but detailed supervision for non-routine tasks. *Id.* The ALJ determined that this RFC prevented Langrell from

performing her past relevant work. (Tr. at 25).

At Step Five, the ALJ relied on the testimony of a Vocational Expert ("VE") to find that, based on Langrell's age, education, work experience and RFC, she could perform other jobs that existed in significant numbers in the national economy, specifically, a teller in the utility industry and a membership solicitor. (Tr. at 25-26). Thus, the ALJ found that Langrell was not disabled. (Tr. at 26).

**IV.    Discussion:**

A.  Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

It is not the task of this Court to review the evidence and make an independent

decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

   B.  Langrell's Arguments on Appeal

Langrell argues that substantial evidence does not support the ALJ's decision to deny benefits. She makes several arguments, which can be boiled down to two: 1) the RFC assigned by the ALJ was not supported by the evidence in the record as a whole; and 2) the ALJ did not give proper weight to the opinion of Scott K. Gray, D.P.M (Doctor of Podiatric Medicine). After reviewing the record as a whole, the Court concludes that the ALJ did not err in denying benefits.

While Langrell alleges several severe impairments, she primarily focuses on her diabetic neuropathy and bilateral foot pain. The Court limits its discussion to that issue.

Langrell saw her family doctor, Timothy C. Reece, M.D., on February 12, 2013. (Tr. at 215). She complained of back pain, but she did not mention pain in her feet. *Id.*  Straight-leg raise was negative. (Tr. at 216). Dr. Reece noted that she had untreated, but controlled, Type II diabetes. *Id.*

On February 18, 2013, Langrell saw Dr. Gray for bilateral foot pain with

cramping and swelling in her toes. (Tr. at 228). She complained of shooting pain in her hips and back. *Id.* X-rays done that day of the left and right foot revealed neuroma in the second and third metatarsal interspace in the right and left foot, functional hallux limitus bilaterally, and adductovarus hammertoe deformity of the fifth toe bilaterally. (Tr. at 229). Because of Langrell's high blood pressure, Dr. Gray declined to give her steroid shots.[2] (Tr. at 228). Instead, he administered 4% alcohol sclerosing injections. (Tr. at 229). He also prescribed arch supports. (Tr. at 230).

Langrell returned to Dr. Reece on February 26, 2013 and complained of pain all over her body. (Tr. at 218-220). She did not mention foot pain. Dr. Reece diagnosed hypothyroidism, hypertension, and Type II diabetes. (Tr. at 220). Dr. Reece noted that she had not taken medications for several years, and suggested an aggressive treatment for diabetes. *Id.*

On March 14, 2013, Langrell returned to Dr. Gray with burning and cramping in her feet and elevated blood sugar. (Tr. at 226). Dr. Gray told her that if her blood sugar stayed high, she would have serious foot problems. *Id.* He diagnosed Type II diabetes with neuropathy, and gave her alcohol sclerosing injections again. (Tr. at 227). He also prescribed amitriptyline for neuropathy. *Id.*

Langrell saw Dr. Gray again on April 9, 2013 and said that the amitriptyline

---

[2]Langrell had stopped taking her blood pressure medication.

was helping. (Tr. at 253). He reiterated that uncontrolled diabetes would cause pain in her feet, and cautioned her about eating better. *Id.* Again, Dr. Gray gave Langrell alcohol sclerosing injections, and he instructed her to wear arch supports at all times. *Id.* Langrell tolerated the injections well without complications. (Tr. at 254).

Langrell complained of cramping and burning in her feet at a May 7, 2013 appointment with Dr. Gray. (Tr. at 251). She said she could not stand on her feet for very long. *Id.* Dr. Langrell prescribed Neuremedy, a neuropathy vitamin, and told her to continue using arch supports. *Id.*

Langrell returned to Dr. Reece on May 16, 2013. Although she had told Dr. Gray she was seeing Dr. Reece for her foot problems, she did not mention her feet at all to Dr. Reece. (Tr. at 237). Dr. Reece's diagnoses did not include foot problems. *Id.* Langrell saw Dr. Reece again on June 5, 2013, complaining of generalized pain, but again, she did not mention her feet. (Tr. at 234).

On June 7, 2013, Langrell saw Dr. Gray again and reported that the Neuremedy had nearly resolved the foot pain and that she was sleeping better. (Tr. at 248). Impairments that are controllable or amenable to treatment do not support a finding of total disability. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). Along with functional hallux limitus bilaterally, Dr. Gray diagnosed chronic Morton's neuromas in the right and left foot. (Tr. at 248). Dr. Gray repeated the alcohol sclerosing

injections. *Id.*

Langrell went to the emergency room at Hot Springs County Medical Center on June 9, 2013, complaining of generalized pain. (Tr. at 263). She did not mention any foot problems, nor were any foot diagnoses made. (Tr. at 264).

Thereafter, Langrell did not seek medical treatment of any kind until November 21, 2013 and December 5, 2013, when she saw Dr. Gray. (Tr. at 293, 294). She reported that, while she was raking leaves, a brown recluse spider bit her on her foot, resulting in necrosis in the area of the bite. *Id.* Dr. Gray treated the infected area, prescribed Bactrim to prevent infection, and continued Langrell on Neuremedy. *Id.* At the second visit, Langrell reported that she was very pleased and the necrotic area had healed with treatment. She said the Neuremdy was helping with the neuropathy. *Id.* Positive response to treatment undermines claims of disability. *See Mittelstedt*, 204 F.3d at 852.

At a follow-up visit to Dr. Gray on February 26, 2014, Langrell stated that her diabetes was better and the Neuremdy continued to improve the neuropathy. (Tr. at 292). Dr. Gray debrided her toenails and corns and calluses on her feet, and he repeated the alcohol sclerosing injections. *Id.*

Langrell's foot conditions worsened in March 2014 and she decided she wanted Dr. Gray to perform surgery to remove a bunion, correct her hammertoes, and remove

the neuromas in her left second and third toes. (Tr. at 290). On March 26, 2014, Dr. Gray performed that surgery. (Tr. at 285). Post-surgery x-rays showed good placement and alignment. (Tr. at 287).

On April 1, 2014, Dr. Gray saw Langrell and found good alignment and range of motion in her feet. (Tr. at 283). She was instructed to rest, use ice, and elevate her feet. *Id.*

Langrell did not follow Dr. Gray's advice to rest, and admitted she had been walking too much at an April 8, 2014 appointment. (Tr. at 281). Failure to follow a prescribed treatment weighs against a claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). As a result of her overexertion, Langrell had fractured her left first metatarsal. (Tr. at 281). Dr. Gray prescribed a fracture boot and again stressed that she rest and elevate her foot. (Tr. at 282).

On April 15, 2014, Langrell reported to Dr. Gray that she was much better after having worn the boot, and Dr. Gray found good alignment and muscle strength in her feet. (Tr. at 280). He told her to wear her boot at all times. *Id.*

Langrell returned to Dr. Gray on May 1, 2014, at which time he found tenderness upon range of motion at the fracture site, but good alignment in her toes. (Tr. at 278). The left fifth toe arthroplasty was healing in a good position. *Id.* Dr. Gray continued the Neuremedy and told her to keep wearing the boot, and to rest and

elevate her feet. (Tr. at 279).

On May 22, 2014, Langrell returned to Dr. Gray for x-rays and follow-up. (Tr. at 276). Since the fracture of her toe she had good alignment, her swelling was down, and she had minimal scar tissue. *Id.* She still had a bunion, hammertoes, and hallux abductovalgus of the right foot. *Id.* Dr. Gray discussed a second surgery to address those problems. (Tr. at 277). She never had that surgery. Dr. Gray told her to remove the boot and begin exercises for her left foot. *Id.*

On June 16, 2014, Langrell presented to Dr. Gray with an ingrown toenail, which he removed. (Tr. at 275). He told her to follow up in two weeks. *Id.* There is no evidence that she followed up with Dr. Gray or any other doctor.

Langrell's administrative hearing was July 10, 2014. Dr. Gray submitted a letter, dated July 11, 2014, which stated that she had moderate diabetic neuropathy and had problems standing on her feet for periods of 6 to 8 hours. (Tr. at 308).

Two state-agency medical consultants reviewed Langrell's records and concluded she could perform medium work with no postural limitations. (Tr. at 83, 93). Those reports were dated April 23, 2013, and August 17, 2013. *Id.*

On February 20, 2013, almost a year before the corrective foot surgery, Langrell filled out a function report indicating she could attend to personal care, prepare simple meals, fold clothes every day, go outside 3-4 times a week, drive a car,

and shop in stores. (Tr. 154-161). In November 2013 she was raking leaves when she was bitten by a spider. (Tr. at 293, 294). She indicated that medications "made me feel weird" and did not help her pain, which contradicts her reports, at multiple doctor visits, that Neuremedy and amitriptyline helped and that her diabetes was under control. (Tr. at 152).

Overall, while Langrell had foot problems, she was helped by treatment. Three of her office visits were related to acute episodes: a spider bite, a toe fractured as a result of her walking more than her doctor recommended, and an ingrown toenail. All of these conditions were treated and her foot problems improved. For example, after her foot surgery, Langrell's range of motion increased, and Dr. Gray recommended she resume exercises. Langrell did not follow Dr. Gray's instruction to see him again in July 2014, and she did not pursue a second surgery although Dr. Gray recommended it. Again, failure to seek recommended treatment undermines a claim of disability. *See Mittelstedt,* 204 F.3d at 852. Finally, during several appointments with Dr. Reece in 2013, Langrell did not mention foot problems, although she reported debilitating foot pain to Dr. Gray over the same time period. This detracts from her credibility.

Langrell takes issue with the ALJ's determination that her RFC allowed her to perform light work. A claimant's RFC represents the most he can do despite the

combined effects of all of his credible limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). In determining the claimant's [RFC], the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of [his] impairments. *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010); *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996). The ALJ bears the primary responsibility for assessing a claimant's RFC - that is, what he or she can still do, in spite of severe impairments. *Wildman*, 596 F.3d at 969.

In arriving at Langrell's RFC, the ALJ considered not just the medical evidence, which showed general improvement and positive response to treatment, but also the activities Langrell herself said she could do. She stated that she had pain while doing some of the relevant activities, but this was before her surgery and subsequent improvement. And the fact that she raked leaves during the relevant period when her pain was allegedly severe indicates that her symptoms are not as debilitating as she alleged. The ALJ considered the opinions of the two state-agency physicians that she could do medium work, but gave Langrell "the benefit of the doubt" and concluded she could perform light work. (Tr. at 24). Thus, the Court concludes that the ALJ did not err in his RFC determination.

While Langrell argues that the ALJ should have given more weight to Dr.

Gray's opinion letter, dated the day after the administrative hearing, the content of that letter is inconsistent with Dr. Gray's objective findings of improvement over time. *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (the ALJ may discount a treating physician's opinion where he renders inconsistent opinions that undermine his credibility); *see Guilliams*, 393 F.3d at 803 ("physician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies."). Dr. Gray noted Langrell experienced long-term relief from Neuremedy and that her surgery healed well. She had improved range of motion and was able to commence exercise. As noted above, a significant portion of Langrell's foot problems were either acute in nature or self-inflicted due to her failure to follow the directions of her treating physicians. Thus, the Court concludes that the weight the ALJ assigned to Dr. Gray's opinion evidence was appropriate given the evidence in the record as a whole.

## V. **Conclusion:**

There is substantial evidence to support the Commissioner's decision that Langrell was not disabled. The ALJ correctly determined the RFC and gave the proper weight to Dr. Gray's opinion.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be AFFIRMED and that the case be DISMISSED, with prejudice.

DATED this 14th day of February, 2017.

_____
UNITED STATES MAGISTRATE JUDGE